UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TANEHA EDWARDS, ADMINISTRATRIX OF THE ESTATE OF WILLIE MCDOWELL, JR. PLAINTIFF, | : : : : : | CIVIL ACTION NO. 3:05-cv-1261 (JCH) |
| v. | : : | |
| UNITED STATES OF AMERICA DEFENDANT. | : : | JANUARY 25, 2008 |

**BENCH TRIAL RULING**

The plaintiff, Taneha Edwards, brings this medical malpractice claim against the defendant, United States of America, arising out of the death of her father, Willie McDowell, Jr. on August 30, 2002 at the Veterans Affairs Hospital ("the VA") in West Haven, Connecticut. Edwards brings this complaint pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. Jurisdiction is based on the existence of a federal question under 28 U.S.C. § 1331. Edwards's claim was tried before the court on December 10, 2007 through December 12, 2007.

**I.  FINDINGS OF FACTS**

McDowell voluntarily admitted himself into the West Haven VA on July 5, 2002, for help with chronic alcoholism. When McDowell presented at the VA, he had a history of alcohol and drug abuse, cigarette smoking, hepatitis C, liver disease, depression, and auditory hallucinations, and had received psychiatric treatment for suicidal thoughts. Prior to his admission, McDowell had been working as a truck driver and earning around $25,000 a year. When he was driving, he would stay in his truck and

between trips would stay with Edwards at her home in Connecticut. He enjoyed a good relationship with his daughter and her children. Upon arriving at the VA, McDowell was seen in the psychiatric emergency room ("psychiatric ER"), where Dr. Jaakko Lappalainen wrote a progress note indicating that the treatment plan was to use "symptom triggered detoxification" to treat McDowell. Def.'s Ex. 56 at 1851-1854.

The plaintiff's expert witness, Dr. James Merikangas, gave his expert medical opinion as to McDowell's course of treatment at the VA. Dr. Merikangas is a clinical professor of psychiatry and behavioral sciences at George Washington School of Medicine and has been practicing medicine since graduating from John Hopkins University School of Medicine in 1969.

McDowell did not show signs of alcohol withdrawal for the first few days of his stay at the hospital. However, between July 8 and July 9, 2002 his pulse rate rose from around 96-97 to between 101-110. See id. at 1868-9 and 1885. According to Dr. Merikangas, McDowell's rising pulse was an early indicator that McDowell was suffering from alcohol withdrawal. On July 8, 2002, McDowell was treated with orally administered Ativan, a sedative of the class of drugs known as "benzodiazepines" used in the treatment of alcohol withdrawal. See id. at 1871. The dosage administered was not recorded. Id. It is unclear from the record whether he received Ativan at other times during this initial four day period, though one note in his medical record made July 8, 2002, indicates that he was medicated with Ativan "throughout his stay." Id. at 1875.

Dr. Merikangas testified that not treating McDowell with doses of Ativan sufficient to prevent the onset of Delirium Tremens (the "DTs") at the point his pulse began to rise, or even earlier in his hospital stay, was a violation of the standard of care.

2

Delirium Tremens is "a severe form of delirium, sometimes fatal, due to alcoholic withdrawal following a period of prolonged intoxication." Def.'s Glossary of Med. Terms ("Def.'s Glossary")(Doc. No. 38)(quoting STEDMANS MEDICAL DICTIONARY 105260 (27th ed. 2000).

The government's expert, Dr. Richard J. Frances disagreed, stating that early preventative treatment of the DTs with Ativan had been the standard of care in the past, but that the standard of care had changed. According to Dr. Frances, the current standard of care is to wait until the onset of withdrawal symptoms before beginning treatment with Ativan. In light of this conflicting expert testimony as to the standard of care in treating alcohol withdrawal, the court credits the testimony of Dr. Merikangas. Dr. Frances admitted that early preventative treatment of the type Dr. Merikangas described had been the standard of care in the past, but did not offer sufficient support in the form of publications or other evidence for the court to credit his opinion that the standard of care had changed.

Later in the day McDowell's pulse had risen, a nurse reporting on McDowell's progress observed that he was pulling the blankets off his bed, spilling juice, having difficulty swallowing pills, taking off his shirt, wandering, and needing assistance eating his afternoon meal. See id. at 1886. Another nurse's note from that day states that McDowell started demonstrating signs of delirium, was talking psychotically, and was unable to drink from a milk carton. See id. at 1887. Dr. Patrick Fox examined McDowell on July 9, 2002, and reported that he had "demonstrated a rapid deterioration in mental status" and was confused, disoriented, and speaking incomprehensibly. Id. at 1890.

3

The VA transferred McDowell to the medical emergency room ("medical ER") on July 10, 2007. See id. at 1907. There he was given Ativan intravenously and given a laxative. See id. He was transferred back to the psychiatric ER that same day to "complete detox." Id. Dr. Merikangas testified that transferring McDowell back to the psychiatric ER at this point was a deviation from the standard of care because he could not receive the intravenous fluids necessary for his treatment in the psychiatric ER.

The staff in the psychiatric ER transferred him back to the medical ER on July 11, 2002 "because of concern . . . that he [was] actively experiencing delirium tremens ("DTs"). Id. Ryan O'Connell[1] writes on July 11, 2002 that he believes McDowell is suffering from withdrawal but not "frank Delirium Tremens." Id. at 1906. He further recommends that, if McDowell's heart rate and blood pressure continue to rise, he should receive more benzodiazepines, but cautions that with McDowell's decreased liver function, such drugs should be used "gingerly" to avoid lethargy. Id. McDowell was returned to the psychiatric ER, where he was put in restraints and treated with Ativan. See id. at 1910, 1912. On July 11, 2002, McDowell was returned to the medical ER, and then admitted to the hospital later that day. See id. at 1914 and 1919. Upon admission to the hospital, the medical student, who wrote McDowell's Admission Note, noted that he had an abnormal chest x-ray on July 10, 2002, and suggested that he have another chest x-ray. See id. at 1498. McDowell's doctors ordered that he not receive anything by mouth, including food or medicine, because he was "such a high aspiration risk." Id. at 1515.

---

[1] It is unclear from the record whether O'Connell was a doctor or other staff. See Def.'s Ex. 56 at 1906.

4

It was around this time, between the 12th and the 16th of July 2002, that McDowell's daughter, Taneha Edwards first came to visit her father.[2] She found him restrained to his hospital bed with his legs hanging over the side. When she first saw him, the head of the bed was elevated, but McDowell was slumped down in the bed so that he was laying flat on the lower portion. Edwards requested help raising her father into an upright posture and did eventually receive help. Dr. Merikangas testified that allowing McDowell, who was known to be an aspiration risk, to lie flat on his back was a violation of the standard of care as he was more likely to aspirate in that position.

On July 16, 2002, McDowell was given a "Dobhoff tube," which is a nasogastric feeding tube for administering nutrition to patients unable to eat orally. See id. at 1547. McDowell was also put on "aspiration precautions" at this time. See id. On July 16, 2002, McDowell had a chest x-ray, in which the radiologist reported seeing the Dobhoff feeding tube "with metallic tip coiled in the fundus of the stomach with tip directed back towards the gastroesophageal junction." Id. at 1551. He also reports "opacities" in the lungs which she believes may be "aspiration pneumonitis".[3]

Dr. Merikangas testified that giving McDowell a nasogastric feeding tube at this point was a violation of the standard of care, because he had ileus, or paralysis of the

---

[2]Edwards testified that she initially tried to contact her father by phone a couple of days after he went to the hospital, but the hospital was unable to tell her where he was located. She then waited a week to ten days and heard from a family friend who gave her a number to call to locate him.

[3]Neither party provided the court with a definition of "aspiration pneumonitis". See Def.'s Glossary of Medical Terms, (Doc. No. 38) and Pl.'s Glossary of Medical Terms (Doc. No. 42). An online medical encyclopedia provided by the U.S. National Library of Medicine and the National Institutes of Heath defines it as "inflammation of the lungs and bronchial tubes due to breathing in a foreign material." A.D.A.M. Medical Enclyopedia, http://www.nlm.nih.gov/medlineplus/ency/article/000121.htm (last visited January 9, 2008).

bowel, which made it more likely that he would regurgitate anything he took into his stomach. Dr. Merikangas also testified that the placement of the Dobhoff tube was incorrect, which was a violation of the standard of care. According to Dr. Merikangas, the Dobhoff tube should have been in the duodenum, or the small intestine; its placement in McDowell's stomach increased the likelihood he would aspirate.

On July 19, 2002, a medical intern assessing McDowell's status reported that "his course has been slow but he is improving." Id. at 1573. She reported that he was not alert, or oriented, that he squeezed her hand when commanded but did not open his eyes. Id. That same day, McDowell's nurse notes that he is arousable to tactile stimuli, showing no signs of respiratory distress, and is not in acute distress. See id. at 429. There is no doctor's note from July 20, 2002. A nurse's note documenting the shift from 8 p.m. on July 20, 2002 until 8 a.m. on July 21, 2002, notes that McDowell is "sedated but arousable." Id. at 436.

On July 21, 2002, McDowell was given another chest x-ray. See id. at 1578. In this x-ray, the doctor reports seeing the Dobhoff tube and suggests that it "should be advanced for better placement." Id. He further reports that there is "worsened focal opacity in the right lung base," which was not seen in the July 11, 2002 x-ray. Id. He believes a portion of this is due to the collapse of McDowell's right lower lobe and writes that "Pneumonia in this region is possible." Id. That same day, the doctor's note states that McDowell is "not responsive to speech" and "did not open eyes." Id. at 1577. On July 22, 2002, Dr. Chris Ruser examined McDowell and found that his mental state had gradually declined over the prior 48-hour period. See id. at 1584. When writing this note, Dr. Ruser thought that McDowell's most recent chest x-ray raised "suspicion of

6

aspiration in context of tube feedings." Id. The medical intern who saw McDowell that day noted that the overnight nurse reported "vomitus." Id. at 1583. According to Dr. Merikangas, this evidence of vomiting indicates that the contents of the feeding tube were traveling in the wrong direction and indicated a high risk that McDowell would aspirate.

McDowell had another chest x-ray on July 22, 2002, this time indicating that the Dobhoff tube had been re-adjusted for "placement correction" and that the tip of the tube was now placed in the duodenum. Id. at 1585. The doctor reading this x-ray also noted that McDowell's right lower lobe had completely collapsed since the day before. See id.

On July 23, 2002, a nurse tending to McDowell writes that he is not responsive, that he is not in respiratory distress but that his lungs sound coarse. See id. at 442. A doctor's note that day notes that McDowell's condition has "worsened acutely over the past four days" and again noting "suspicion of aspiration in context of tube feedings." Id. at 1588. Just past midnight on July 24, 2002, a doctor's note indicates that McDowell was "intubated due to respiratory compromise and transferred to the intensive care unit (the "ICU"). Def.'s Ex. 56 at 1600. Intubation means that an endotracheal tube was put into McDowell's lungs so that a ventilator could breathe for him. The ICU doctors taking over McDowell's care note that he was minimally improving until around July 21 or 22, at which point he developed a right lower lobe pneumonia which progressed to a right lower lobe collapse and "hypoxic respiratory failure requiring intubation." Id. at 1604.

After July 24, 2002, McDowell appears to have had an uneventful stay in the ICU

until August 17, 2002, when he was transferred back to the medical floor. See id. at 1976. By that time he had started to show improvements to his neurologic function including following commands, making purposeful movements, and attempting to speak. Id. By August 22, 2002, McDowell's mental state had "improved markedly." Pl.'s Ex. 57 at 2009. He was responsive to voice, able to follow simple commands and expressing "relatively complex" emotions like "shoulder shrugs and hand gestures to augment verbal answers." Id. At that time, McDowell underwent a tracheostomy due to prolonged intubation. A tracheostomy is "an operation to make an opening into the trachea, or windpipe". Def.'s Glossary at 3. His doctor wrote that his diagnosis at this point was "presumed anoxic brain injury" due to aspiration. Id. Starting on August 22, 2002, McDowell's medical records indicate that he was bleeding from the site of the tracheostomy. Id. at 2015, 2018 and 2019. On August 27, 2002, McDowell began to bleed heavily from the site and died on August 20, 2002.

Dr. Merikangas testified that the deviations from the standard of care that he identified -- not properly preventing DTs by treating McDowell with Ativan early in his visit, not properly treating the DTs once symptoms emerged, allowing him to lie flat while on aspiration precautions, and not properly placing the nasogastric feeding tube– were the causes of McDowell's death to a reasonable degree of medical probability.

## II.   CONCLUSIONS OF LAW

The Federal Tort Claims Act ("FTCA") provides that district courts have jurisdiction over claims against the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government . . . where the United States, if a private person, would be liable to the claimant in accordance with

the law of the place where the act or omission occurred." U.S.C. § 1346(b)(1). Under Connecticut law, to establish a claim of medical malpractice a plaintiff must show "(1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." Carrano v. Yale-New Haven Hospital, 279 Conn. 622, 656 (2006) (quoting Boone v. William Backus Hospital, 272 Conn. 551, 567 (2005)).

To establish a causal connection, a plaintiff must show that "defendant's negligent conduct was a cause in fact and the proximate cause of the decedent's injuries and death." Boone, 272 Conn. at 571. The test for cause in fact is whether "the injury would have occurred were it not for the defendant's negligent conduct." Id. (internal quotation omitted). The test for proximate cause is whether the defendant's conduct was "an actual cause that is a substantial factor in the resulting harm." Id. "The substantial factor test, in truth, reflects the inquiry fundamental to all proximate cause questions; that is, whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence." Id. Generally, a "plaintiff must present expert testimony in support of a medical malpractice claim because the requirements for proper medical diagnosis and treatment are not within the common knowledge of laypersons." Carrano v. Yale-New Haven Hospital, 279 Conn. 622, 657 (2006). Expert medical opinion evidence is particularly important to show causation because "the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." Poulin v. Yasner, 64 Conn.App. 730, 738 (2001)(internal quotation omitted).

The expert testimony of Dr. Merikangas convinced the court that the standard of

9

care for the treatment of DTs required more aggressive administration of Ativan both to prevent the onset of symptoms, and to treat the DTs once symptoms, such as McDowell's rising pulse and agitated behavior, became apparent. As discussed above, the court was not persuaded by the government's expert that the standard of care for the administration of Ativan early in the treatment of alcohol withdrawal had changed. The court finds that, by failing to treat McDowell more aggressively with Ativan prior to July 10, five days after he arrived at the hospital asking for help with alcoholism, the VA breached the standard of care. Furthermore, the court credits Dr. Merikangas' expert testimony that McDowell's nasogastric feeding tube was improperly placed and that he was allowed to lie flat on his back, both in violation of the standard of care for a patient at high risk of aspiration.

Having determined that there were several breaches of the standard of care, the court must next determine whether these breaches were the cause of McDowell's death. In deciding this question, the court relied on the testimony of Dr. Merikangas to conclude that a causal connection existed between the VA's breaches of the standard of care and McDowell's subsequent death. The court found Dr. Merikangas' testimony credible because of his extensive experience in the field and his obvious familiarity with the record.

According to Dr. Merikangas, had McDowell been properly treated with Ativan early in his stay at the VA, he would not have developed such dramatic symptoms of the DTs and thus would not have required tube feeding. It was clear that even after noting that McDowell was a high aspiration risk, the VA allowed McDowell to lie flat on his back, increasing his risk of aspiration. Similarly, once the tube feeding began, the

10

hospital staff allowed the tube to remain misplaced despite the fact that McDowell was at a high risk of aspiration and that the tube's misplacement made that risk even higher.[4] The court credits Dr. Merikangas's conclusion that these violations of the standard of care were causes in fact of McDowell's death because his aspiration and brain injury would not have occurred but for these breaches. These breaches were also proximate causes of McDowell's death because aspiration was clearly harm of "the same general nature as the foreseeable risk created" by the VA's breaches of the standard of care. Boone, 272 Conn. at 571.

The court further credits Dr. Merikangas' view that McDowell's aspiration, which caused anoxic brain injury and decreased lung function, caused him to require a tracheostomy to breathe. It was from the site of this tracheotomy, which would not have been necessary but for the VA's breaches of the standard of care, that McDowell bled to death on August 20, 2002. Therefore, the VA's malpractice not only caused McDowell's aspiration and brain injury, but lead directly to his death.

## III. DAMAGES

Having concluded that the VA's breaches of the standard of care were both a cause in fact and the proximate cause of McDowell's death, the court turns to the appropriate amount of damages due Edwards. Assessing damages in death cases "gives no precise mathematical formulas" because it must "of necessity represent a crude monetary forecast of how the decedent's life would have evolved." Katsetos v. Nolan, 170 Conn. 637, 658 (1976). In this case, assessing how McDowell's life would

---

[4]The VA radiologist noted the misplacement on July 16, 2002 (see Def.'s Ex. 56 at 1551). But it was not until July 22, 2002, and after a second chest x-ray showing the misplacement, that the tube was properly placed. See id. at 1578 and 1585.

11

have evolved presents a particular challenge given that McDowell had several serious, chronic medical conditions. The National Vital Statistics Report produced by the Center for Disease Control, predicts that a 52-year-old African-American male can expect to live 23.2 years. See Pl.'s Ex. 9 at 22. However, it was clear from the testimony of Dr. Merikangas that McDowell was in far worse health than the average man his age. Therefore, making an admittedly "crude monetary forecast" of how McDowell's life would have evolved, the court determines that McDowell could have expected to live at most another eight years, and that he could have expected to work for another six. Given that McDowell was earning around $25,000 per year prior to his death, the court awards $150,000 for McDowell's lost earnings. The court also awards $150,000 for McDowell's loss of enjoyment of the years he had remaining. Therefore, the total damages amount awarded is $300,000.

## IV.    CONCLUSION

Based on the preceding findings of fact and conclusions of law, the court orders that judgment enter in favor of the plaintiff in the amount of $300,000.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 25th day of January, 2008.

                                    /s/ Janet C. Hall
                                    Janet C. Hall
                                    United States District Judge